**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JASON PATT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23 CV 318 |
| | ) | |
| LAKE COUNTY CORONER'S | ) | Judge John J. Tharp, Jr. |
| OFFICE, and LAKE COUNTY | ) | |
| CORONER JENNIFER BANEK, in her | ) | |
| official and individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants' motion to dismiss [9] is denied. See Statement for details. This case is referred to the assigned Magistrate Judge for all discovery scheduling and supervision, resolution of any motions for protective orders, and any settlement conference the parties may seek.

## STATEMENT

### I.    Background

Plaintiff Jason Patt worked for the Lake County Coroner's Office from 2007 to December 15, 2020. He was appointed Chief of the Coroner's Office in 2016. The position of County Coroner is an elected position and Patt knew that it was likely that he would be removed from his appointed position as Chief of the Office if a new Coroner was elected in the November 2020 election. ¶ 14. As it happened, Defendant Jennifer Banek was elected as the County Coroner in the 2020 election. She and Lake County Director of Human Resources John Light met with Patt on November 30, 2020, the day before Patt took office. They informed Mr. Patt that he would be replaced as Chief because it was an appointed position, but in light of his lengthy and valued service he would be permitted to retire in lieu of termination. Banek told Patt that if he submitted a letter of retirement, she would tell any prospective employers that Patt honorably retired from the Coroner's Office.

Among other duties as Chief of the Office, Patt was the handler and constant companion of "Bones," the Office's cadaver-sniffing dog. Anticipating that Bones might have difficulty adjusting to a new handler if Patt was replaced as Chief of the Office, in the months leading up to the November 2020 election, Patt began trying to enforce "separation time" for Bones by having him sleep in the basement instead of Patt's bedroom and leaving Bones at home more often when the dog was not needed for work.

These changes sent Bones into a tail-spin—literally. Bones began engaging in unusual behaviors such as spinning and barking, defecating and urinating indoors, and destroying furniture. In October 2020, a veterinarian diagnosed Bones with separation anxiety and prescribed an anti-depressant, but the medication did not curtail Bones' aberrant and destructive behavior. As a result, on November 30, 2021 (his last day in office) outgoing Coroner Howard Cooper retired Bones and allowed Patt to adopt Bones in accordance with the Police Dog Retirement Act, 510 ILCS 82/5.

Patt submitted a letter of retirement to Lake County on December 1, 2020, the day after meeting with Banek and Light. Shortly thereafter, however, Banek learned that Patt had adopted Bones just before Banek took office. Banek sent Patt a letter on December 11, 2020, directing Patt to return all property of the Office in his possession, most notably Bones, by December 15, the effective date of Patt's retirement. Patt responded via an attorney who advised Banek that Bones had been retired and adopted in accordance with law and would therefore not be returned to the Coroner's Office.

Patt alleges that his adoption of Bones infuriated Banek and that she retaliated by marking him as ineligible for rehire in his County personnel record. Patt alleges that before he retired from the Coroner's Office, he had been in discussions with the Lake County Sheriff's Office about a range of law enforcement employment opportunities, but those discussions abruptly ended after Banek took office. Numerous other applications for security-related employment were also unsuccessful. Based on records he obtained after making a FOIA request, Patt also alleges that Banek told an investigator who was doing a background check on Patt for a security clearance that she (Banek) had been informed that Patt had often failed to show up for work, had engaged in extramarital affairs, and that she had adverse information about Patt's finances and his general conduct. Patt alleges that it is "evident" that Banek made such statements to prospective employers in light of his difficulty securing a job. Ultimately, Patt was only able to secure employment at the Great Lakes Naval Station as a Drug Program supervisor, a position for which he was over-qualified.

## II.    Analysis

Mr. Patt claims that Banek effectively blacklisted him from obtaining other law enforcement positions and offers three legal theories under which he is entitled to relief, each set forth in a separate count.[1] In Count One, Patt asserts that Banek's conduct deprived him of

---

[1] At the outset, it is important to recognize the difference between "claims" and "counts." "A claim is the aggregate of operative facts which give rise to a right enforceable in the courts." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012) (cleaned up). "Counts" are the authorized device for asserting distinct claims—that is, claims "founded on a separate transaction or occurrence"—*see* Rule 10(b)—but are often improperly employed but to assert different legal theories in support of a claim. As Judge Shadur explained in *Bonestroo, Rosene, Anderlik & Assocs., Inc. v. Devery*, No. 05 C 2184, 2006 WL 1005284, at *11 (N.D. Ill. Apr. 12, 2006), "the use of separate counts to set out different theories of recovery is a mistaken manifestation of the state law 'cause of action' approach, rather than the federal concept of 'claim for relief' (*see NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir.1991)). That is not what Rule 10(b)'s last sentence defines as the proper role for any such separation of a pleading into different counts." *See also*, *e.g.*, *Orthodontic Centers of IL v. Michaels*, 407 F. Supp. 2d 934, 935 (N.D. Ill.

occupational liberty without due process, in violation of the 14th Amendment. Count Two invokes state defamation law, and Count Three maintains that Patt is entitled to relief under a theory of intentional infliction of emotional harm. The Court has jurisdiction over Banek's claim under 28 U.S.C. § 1331 and § 1367.

"A government employer infringes an employee's occupational liberty interest when, without constitutionally adequate process, it places the employee's good name, reputation, honor, or integrity at stake or imposes a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities. To succeed on an occupational liberty claim, an employee must prove that: "(1) he was stigmatized by the employer's actions; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure." *Dunn v. Schmitz*, 70 F.4th 379, 382–83 (7th Cir. 2023) (internal quotation marks and citations omitted). Critically, the stigmatizing material must have been published incident to the termination of the plaintiff's employment. *Siegert v. Gilley*, 500 U.S. 226, 234 (1991); *Paul v. Davis*, 424 U.S. 693, 710 (1976) (to deprive a defendant of due process, defamation by a state official had to occur in the course of the termination of employment).

The defendants maintain that Patt has no claim for relief under this theory because he was not terminated from the Coroner's Office, but retired. In *Siegert*, the Supreme Court held that the plaintiff had failed to state a claim for denial of a constitutional right of occupational liberty where the plaintiff had voluntarily resigned in lieu of termination. Pointing to *Siegert*, the defendants argue that a voluntary resignation (or here, retirement) is not a termination of employment and stigmatizing statements about an employee who resigns his employment do not deny due process. Citing *Wright v. Illinois Dep't of Child. & Fam. Servs.*, 798 F.3d 513 (7th Cir. 2015), but without discussing *Siegert*, Mr. Patt maintains that he was constructively discharged when Banek told him that he would be terminated if he did not retire. In *Wright*, the Seventh Circuit explained that a constructive discharge occurs "when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id*. at 527. Patt has adequately alleged that he was constructively discharged under this definition, but *Wright* was an employment discrimination case, and did not address the constitutional question of whether a constructive discharge implicates the due process requirement for the loss of a property interest.

Employment discrimination and due process protect different interests and may therefore require different standards for establishing when adverse employment actions are actionable. *Cf. Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018) (noting differences between conduct qualifying as adverse employment action in context of Title VII discrimination and antiretaliation provisions). The defendants have offered no rationale, however, for treating a constructive discharge differently than an express termination in the context of an occupational liberty claim. An argument can be (but has not been) made that although constructive discharge is actionable in the context of a discrimination claim, it would be reasonable to set the adverse action bar higher (by requiring express termination) in the context of an occupational liberty claim, which vindicates stigmatization that damages reputation to a degree that it forecloses prospective

---

2005) ("the concept of a separate count … does not properly encompass the statement of what is no more than a different theory of recovery on the same claim.").

employment opportunities in addition to ending the existing employment relationship. Constructive discharge typically does not implicate that concern because the reasons for the constructive discharge are not discernable to outsiders; what is observed is only a voluntary resignation. *Siegert*, 500 U.S. at 228 ("Siegert agreed to resign from the hospital and thereby avoid a termination that might damage his reputation."). This is not an entirely satisfactory distinction, however, because it evaporates in a case like this one in which it is alleged that a constructive discharge was accompanied by dissemination of defamatory statements.

Although in *Siegert*, the Supreme Court did not use the term "constructive discharge" in recounting what happened to the plaintiff, the Seventh Circuit has confirmed that *Siegert*'s holding—no violation of occupational liberty—came in the context of facts that established a constructive discharge had occurred. *See Koch v. Stanard*, 962 F.2d 605, 606 (7th Cir. 1992) ("Siegert's employer reassigned him in a way that amounted to constructive discharge. He quit."). Notwithstanding the constructive discharge, the *Siegert* Court held that "[t]he alleged defamation was not uttered incident to the termination of Siegert's employment by the hospital, ***since he voluntarily resigned from his position at the hospital***, and the letter was written several weeks later." *Siegert,* 500 U.S. at 234 (emphasis added). Focusing on the emphasized text above, the defendants read *Siegert* to hold that there is no deprivation of occupational liberty where the plaintiff resigned in lieu of termination.

In reading *Siegert* in that fashion, however, the defendants fail to note that, in rejecting the occupational liberty claim, the Supreme Court also relied on the fact that the disclosure of the defamatory statements occurred several weeks after the plaintiff's resignation. Contrary to the defendants' argument, *Siegert* did not hold that the constructive discharge itself was a sufficient basis to deny the due process claim, but only that denial of the due process claim was required in light of both the constructive discharge and the fact that the defamatory statements were not made incident to the end of the plaintiff's employment. Indeed, in Judge Flaum's concurring opinion in *Koch*, he noted that *Siegert* is a case about "which statements are considered to have been made incident to an adverse employment decision." 962 F.2d at 608.[2]

*Siegert* does not, then, resolve the question of whether an express termination is required to support an occupational liberty due process claim. Perhaps recognizing as much, the defendants also assert that the complaint fails to plausibly allege that Coroner Banek made the statements incident to the constructive discharge. The only specific defamatory statements Banek is alleged to have made were made in connection with a background investigation conducted in 2022 in connection with Mr. Patt's (successful) application for a position as a Drug Program Supervisor at Great Lakes Naval Station. Compl. ¶¶ 27-28. Patt resigned, or was terminated, no later than December 15, 2020, so those statements were made more than a year later. In *Siegert*, statements made only "several weeks" after the plaintiff's constructive discharge did not give rise to a claim, so Banek's alleged statements in 2022 cannot be considered as having been made "incident" to the end of Mr. Platt's employment with the Coroner's Office more than a year earlier.

---

[2] It bears noting as well that the case on which Siegert principally relied also focused on the requirement that the defamatory statements be incident to the employment decision rather than on the nature of the termination. *See Paul v. Davis*, 424 U.S. 693 (1976).

Mr. Patt contends that it is "evident," Compl. ¶ 28, that Banek had made similarly defamatory statements earlier because he applied for many jobs in law enforcement and private security without success. "Evident" may overstate it, but his point has merit: Coroner Banek's willingness (alleged) to share defamatory information with a prospective employer of Mr. Patt in 2022 makes it more than sheer speculation that she would do the same with respect to other prospective employers. (Why would she be willing to defame him to one prospective employer but not to any others?) Further, the complaint sets forth Mr. Patt's seemingly extensive law enforcement experience, lending credence to his contention that his lack of success procuring law enforcement employment after leaving the Coroner's Office was not due to a lack of qualifications. Mr. Patt adequately alleges that despite casting a broad net, he was only hired for a position he was significantly overqualified for, which also buttresses the evidentiary predicate that the reason he was not being hired was information supplied by Banek.[3]

That the complaint plausibly alleges that Banek defamed him to multiple employers, however, does not necessarily carry the day, because it must also be plausible to infer that Banek engaged in such defamation "incident to" his termination. But again, the complaint alleges enough to make the inference that Banek defamed him incident to his termination plausible. In this regard, Mr. Patt alleges that the Lake County Sheriff's office abruptly ended discussions with Patt about prospective law enforcement employment opportunities, including the Director of Homeland Security for that agency, when Banek took office. Compl. ¶ 23. The alleged timing and nature of the ending of those discussions allows a plausible inference that when she took office, Banek engaged in the same type of defamatory conduct she is alleged to have engaged in in 2022. The complaint also alleges that Banek marked "No" in Mr. Patt's Lake County personnel file in response to whether the departing employee is "eligible for rehire." Compl. ¶ 29. The defendants again label this as speculation (because it is made on information and belief), but it finds support in the complaint's allegations that Banek explained to the Great Lakes investigator why Patt was not "eligible for rehire." *Id.* at ¶ 27. Accepting the truth of these allegations, it is reasonable to infer that the question was answered negatively in Patt's personnel file (prompting the investigator's inquiry to Banek) and that Banek was responsible for making that response incident to Patt's departure.

These allegations are thin, to be sure, but they add enough to make plausible the inference that the root of Patt's difficulties finding a job was unfavorable information supplied by Banek. That suffices. To survive a motion to dismiss under Rule 12(b), "[i]t is enough to plead a plausible claim, after which "a plaintiff 'receives the benefit of imagination, so long as the hypotheses are consistent with the complaint'". *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017). Mr. Patt's complaint provides fair notice of his claim: Banek retaliated against him for depriving the Coroner's Office of Bones, an important asset, by defaming him to prospective employers. A full description of the facts that will prove the plaintiff's claim comes later, at the summary-

---

[3] To the extent that the defendants maintain that Mr. Patt's hiring for this position demonstrates that he failed to allege a tangible loss of other employment opportunities, Motion at 9, it lacks any merit. The employment foreclosure required to support an occupational liberty claim is *comparable* employment, not any employment. The complaint clearly alleges that Mr. Patt was overqualified for the Drug Program Supervisor position and that he took that job only because he had been unable to obtain employment suitable to his qualifications and experience.

judgment stage or in the pretrial order. *Id.* (citing *Erickson v. Pardus*, 551 U.S. 89 (2007); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002); and *Swanson v. Citibank, N.A.*, 614 F.3d 400 (7th Cir. 2010).

The Court therefore concludes that the complaint plausibly alleges a claim based on deprivation of occupational liberty.

The defendants also assert that, even if the complaint adequately states a claim for deprivation of occupational liberty against Banek personally, it fails to state a claim against Coroner's Office itself, and Banek in her official capacity as County Coroner.[4] There is no *respondeat superior* liability under § 1983, and the defendants therefore maintain that the Coroner's Office itself cannot be held liable for Banek's actions. Banek, however, is the highest ranking official in the Coroner's Office, and government entities are liable for conduct that is properly attributed to the entity itself, including when the conduct involves a "deliberate act of a decision-maker with final policy-making authority."[5] *Scott v. Dart*, 99 F.4th 1076, 1088 (7th Cir. 2024); *see also Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once." he complaint plausibly alleges that Banek is an agent of the Coroner's Office with such authority. Compl. ¶ 8, and the defendants do not dispute the point. Her official actions constitute policy of the Coroner's Office. If they caused Patt a constitutional injury, the Coroner's Office will be liable. *See, e.g.*, *Valentino*, 575 F.3d at 678 (holding that Village Mayor who was the *de facto* policy maker for the municipality with regard to personnel decisions "such that the Village may be held liable if the jury finds that [mayor] retaliated against [Plaintiff] in violation of her First Amendment rights").

Finally, the defendants argue that the claim must be dismissed as time-barred. Plaintiffs are not required to plead around affirmative defenses, so a statute of limitations defense is misplaced in a motion to dismiss unless "the factual allegations in the complaint unambiguously establish all the elements of the defense." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 566 (7th Cir. 2023). Here, the defendants contend that the complaint's allegations demonstrate that the claim is time-barred because Patt's tenure with the Coroner's Office ended by December 15, 2020, and he did not file his complaint until January 19, 2023, after the applicable two-year limitations period had expired. *See Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) ("§ 1983 claims in Illinois are … governed by a two-year limitations period"). Patt responds, correctly, that his occupational liberty claim did not accrue until he knew, or should have known, that his constitutional rights had been violated. *Logan v. Wilkins*, 644 F.3d 577, 581–82 (7th Cir. 2011). The complaint alleges that Patt only learned of Banek's defamatory statements in 2022 when an investigatory recounted what

---

[4] Patt acknowledges that the complaint is redundant to the extent that it asserts the claim against both the Lake County Coroner's Office and Banek in her official capacity.

[5] The defendants do not dispute that the Coroner's Office is a suable governmental entity. To the contrary, they maintain that the Coroner's Office is a "local public entity" under the state's Tort Immunity Act, 745 ILCS 10/2-107, in arguing that the Office is immune from state law claims founded upon libelous or slanderous statements.

Banek had told him about the reasons Patt was listed as not eligible for rehire, Compl. ¶ 27, so his suit was filed well within the limitations period.

Having concluded that Mr. Patt's complaint states a viable claim for relief under at least one legal theory, no more is required to deny the defendants' motion to dismiss. Rule 12(b)(6) authorizes the dismissal of claims, not legal theories. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7ᵗʰ Cir. 2015). "One claim supported by multiple theories does not somehow become multiple claims." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012). Mr. Patt's complaint presents a viable claim, so there is no need to assess at this stage whether that claim is also viable under the state law legal theories set forth in Counts Two and Three; the complaint survives even if those state law theories are untenable. "A complaint cannot be dismissed merely because one of the theories on which it proceeds, and the facts alleged in support of that theory, do not make out a claim for relief." *Am. Nurses' Ass'n v. State of Ill.*, 783 F.2d 716, 727 (7th Cir. 1986). *See also*, *e.g.*, *ACF 2006 Corp. v. Mark C. Ladendorf, Att'y at L., P.C.*, 826 F.3d 976, 981 (7th Cir. 2016) ("The Victims have a single claim for relief; multiple legal theories in support of that claim differ from multiple claims that must be separately pleaded."); *Churchwick Partners, LLC v. Seal Keystone, LLC*, No. 122CV02251JRSMKK, 2023 WL 2973801, at \*2 (S.D. Ind. Apr. 17, 2023) ("[a] Rule 12(b)(6) motion cannot be used to dismiss individual legal theories advanced in support of a claim, so long as at least one theory, implicit or explicit, remains"). The viability of Mr. Patt's state law theories, or other theories that may be developed, may be explored during discovery and will be determined at summary judgment or a pretrial conference.

\* \* \* \* \*

For the foregoing reasons, the defendants' motion to dismiss the complaint is denied. This case is referred to the assigned Magistrate Judge for all discovery scheduling and supervision, including consideration of any motions for protective orders. The referral also includes any settlement conference the parties may seek.

Dated: January 27, 2025

John J. Tharp, Jr.
United States District Judge